

Priority ___
Send ___
Enter ✓
Closed ___
JS-5/JS-6 _No_
JS-2/JS-3 ___
Scan Only ___

ENTERED
CLERK, U S DISTRICT COURT

MAR 1 4 2001

CENTRAL DISTRICT OF CALIFORNIA
BY

FILED
CLERK, U.S. DISTRICT COURT

MAR -12 2001

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

J. KEITH IDEMA; GARY SCURKA;       )   CASE NO.: CV 00-10316 ABC (RNBx)
KATHY SCURKA; and JIM MORRIS,      )
                                   )   ORDER RE: DEFENDANTS': MOTION TO
                   Plaintiffs,     )   DISMISS PURSUANT TO FED. R. CIV.
                                   )   PRO. 12(B)(6) OR REQUIRE A MORE
     v.                            )   DEFINITE STATEMENT PURSUANT TO
                                   )   FED. R. CIV. PRO. 12(E); MOTION
DREAMWORKS, INC., et al.,          )   FOR SUMMARY JUDGMENT PURSUANT TO
                                   )   FED. R. CIV. PRO. 56 AND 56(F)
                   Defendants.     )
_____)

     This case involves Defendants' contribution to and production of

the motion picture "The Peacemaker," released in 1997, and Plaintiffs'

claims that their own contributions thereto have gone unrecognized and

uncompensated.  Plaintiffs claim violations of federal copyright laws,

as well as various attendant federal and state law claims arising out

of the same or similar facts.  Defendants filed a Motion to Dismiss

all but one claim or to Require a More Definite Statement, as well as

a Motion for Summary Judgment addressed solely to the copyright claims

if they survive the Motion to Dismiss.  These Motions came on for a

regular hearing before this Court on March 12, 2001.  As is explained

below, the Motion to Dismiss is GRANTED IN PART AND DENIED IN PART.

_____ for Summary Judgment is DENIED, without prejudice, as moot.

✓ Docketed
✓ Copies / NTC Sent
_No_ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

62

# I.  PROCEDURAL HISTORY

Plaintiffs Pro Se J. KEITH IDEMA ("Idema"), GARY SCURKA, KATHY SCURKA ("the Scurkas"), and JIM MORRIS ("Morris") (collectively, the "Plaintiffs") commenced this civil action with an initial Complaint filed on September 25, 2000.  The original Complaint alleged 9 causes of action based on the facts alleged therein,[1] and named Defendants DREAMWORKS, INC. dba DREAMWORKS SKG, DREAMWORKS FILMS LLC, DREAMWORKS DISTRIBUTION LLC, DREAMWORKS LLC, STEVEN A. SPIELBERG ("Spielberg") (collectively, the "Dreamworks Defendants"), BANTAM DOUBLEDAY DELL PUBLISHING GROUP ("Bantam"), ANDREW COCKBURN, LESLIE COCKBURN ("the Cockburns"), JESSICA STERN ("Stern"), MICHAEL SCHIFFER ("Schiffer"), PHILLIP PETERSEN ("Petersen") (collectively, "Defendants"), and Doe Defendants 1 through 10.  The original Complaint was 83 pages and 244 paragraphs.  To the extent that its allegations can be summarized, it claimed that "The Peacemaker" was based at least in part on the life story, and/or on several versions of a partly fictionalized story, of the life of the lead Plaintiff, Idema, a former "Green Beret."

On October 30, 2000, the Dreamworks Defendants filed a motion to dismiss the Complaint and/or to require a more definite statement (the "prior motion").  On November 16, 2000, in response to what the Court construed as an Ex Parte request by Plaintiffs to continue the hearing on the prior motion, the Court issued a Minute Order taking the prior motion off calendar and granting Plaintiffs' request to file a First Amended Complaint ("FAC") in lieu of dismissal (the "prior order").

---

[1] Claims in the initial Complaint: (1) Copyright Infringement; (2) Contributory Copyright Infringement; (3) Unfair Competition under Lanham Act; (4) Breach of Implied Contract; (5) Breach of Contract; (6) Violation of Right to Privacy/Publicity; (7) Civil Conspiracy; (8) Declaratory Relief; and (9) Injunctive Relief.

2

The prior order gave Plaintiffs a deadline of December 1, 2000 to file the FAC, and cautioned them that they should do so only "after having reviewed and considered the objections raised by Defendants."[2] Plaintiffs did not make the December 1, 2000 deadline. Instead, on December 4, 2000 they filed another Ex Parte request, this time for an extension of time within which to file the FAC. The Court granted Plaintiffs' requested extension in a Minute Order issued December 6, 2000, and extended the deadline for filing to December 19, 2000. In the December 6, 2000 Minute Order, the Court again cautioned that the FAC should be filed only after review of Defendants' prior motion.

On December 19, 2000, Plaintiffs finally did file an FAC, which expands the claims for relief, rather than (as might be expected in response to Defendants' prior motion) narrowing asserted claims. The FAC contains 12 causes of action: the nine asserted in the original Complaint plus three new claims, for Conspiracy to Infringe Copyright (Third Claim for Relief), for Conversion (Ninth Claim for Relief), and for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Tenth Claim for Relief).[3] The FAC is 96 pages and 295 paragraphs in length (plus one attachment thereto).

---

[2] The Court also observed that, although Plaintiffs' request for leave to file an FAC rendered it inappropriate for the Court to decide the issues in Defendants' prior motion, "the Court cautions Plaintiffs to take quite seriously the arguments raised in Defendants' Motion, and to incorporate those objections into the Amended Complaint that they may file." See Prior Order at 2 (noting, for example, that there must be proof of registration prior to any suit based on copyright).

[3] The full slate of FAC claims are: (1) Copyright Infringement; (2) Contributory Copyright Infringement; (3) Conspiracy to Infringe Copyright; (4) Unfair Competition under Lanham Act; (5) Breach of Implied Contract; (6) Breach of Contract; (7) Theft of Personality/ Violation of Right to Publicity; (8) Civil Conspiracy; (9) Conversion; (10) RICO; (11) Declaratory Relief; and (12) Injunctive Relief.

3

1   The FAC tells the same basic story as the original Complaint, and

2   aside from the addition of new allegations and new claims for relief

3   does not appear to deviate significantly from the original effort.[4]

4   In fact, there is no substantial difference between the two pleadings,

5   as each essentially alleges that Defendants "stole" the idea for "The

6   Peacemaker" from various documentations of Plaintiff Idema's "story."

7   On January 10, 2001,[5] the Dreamworks Defendants filed the instant

8   Motion to Dismiss and/or to Strike Certain Material and/or to Require

9   a More Definite Statement (the "Motion").  The Motion seeks dismissal

10  of the First through Fifth and Seventh through Twelfth Claims for

11  Relief (all claims except the Sixth Claim for Breach of Contract).[6]

12  The Motion is joined by all other named Defendants except Petersen.[7]

13

---

14  [4] Though the Court does not choose to attach a particular legal
15  significance to this fact in light of the Court's determination that
    Defendants' present Motion can be largely granted on its merits, the
16  Court does note that Plaintiffs did not heed the Court's admonition to
    take Defendants' arguments into account before filing their FAC.   In
17  fact, Plaintiffs appear to have largely ignored the prior motion, in
    direct contravention of the Court's prior order not to do so.
18

19  [5] The Motion was actually lodged on January 8, 2001, along with
    an Ex Parte Application by the Dreamworks Defendants seeking leave to
20  file an oversized memorandum of points and authorities.  The Ex Parte
    Application was granted by the Court on January 10, 2001, which then
21  became the effective filing date for Dreamwork Defendants' Motion.

22  [6] The Dreamworks Defendants' papers manifest some confusion as to
    the claims to which the instant Motion is addressed.  Both the caption
23  of the Motion and the substantive arguments therein exclude mention of
    the Sixth Claim for Relief (Breach of Contract).  See, e.g., Motion at
24  20-21 (skipping from the Fifth to the Seventh Claim).  However, at one
    point in the memorandum they ask for dismissal of "all 13 claims" in
25  the FAC.  Motion at 6 (emphasis added).  This appears to be an error,
    given that there are in any event only 12 claims asserted in the FAC.
26  The Sixth Claim is in any case only asserted as to Defendant Petersen.

27
    [7] Notices of Joinder were filed by: Schiffer on January 12, 2001,
28                                                          (continued...)

4

On January 30, 2001, the Dreamworks Defendants[8] filed, on their own behalf and apparently at Plaintiffs' request, a Stipulation and Order to continue the hearing on the Motion to Dismiss from the date of February 12, 2001 which had been noticed. The parties sought to move the hearing to March 5, 2001, and to make Plaintiffs' opposing papers due to Defendants' counsel by no later than February 19, 2001. However, due to its own scheduling, the Court instead moved the date of the hearing to March 12, 2001, leaving the deadline for Plaintiffs' opposition as that agreed to by the parties, February 19, 2001.

Nonetheless, Plaintiffs' Opposition was not filed until February 26, 2001.[9] This conforms with the deadline set by Local Rule 7.6 (14 days prior to hearing date), but not with the parties' Stipulation. Nonetheless, the Court will consider Plaintiffs' tardy Opposition. A Reply was received from the Dreamworks Defendants on March 5, 2001.[10]

---

[7](...continued)
the Cockburns on January 19, 2001, Stern on February 6, 2001, and by Random House, Inc. (named in the FAC as Bantam) on February 16, 2001. Bantam (hereinafter "Random House") also joins in a Motion for Summary Judgment filed by the Dreamworks Defendants on February 20, 2001.

[8] The Cockburns, Schiffer, and Stern are now also represented by the same firm that has represented the Dreamworks Defendants in this matter. For this reason, for the purposes of this Motion only, the appellation "Dreamworks Defendants" will now refer, in addition to the Dreamworks entities/Spielberg, to the Cockburns, Schiffer, and Stern.

[9] Defendant Petersen is the only named Defendant who has filed an Answer to the FAC (on February 13, 2001). Therefore, the Opposition filed by Plaintiffs on February 26, 2001, though titled an "Opposition to Defendants' Motion for Judgment on the Pleadings," is really their Opposition to the Motion to Dismiss. Plaintiffs also requested, and the Court granted (February 28, 2001) leave for an oversized filing.

[10] On February 26, 2001, the Dreamworks Defendants filed a notice of non-receipt of opposition, but have since filed their Reply. In view of the extended time for briefing, no prejudice has resulted.

5

In the interim, on February 20, 2001, the Dreamworks Defendants also filed a Motion for Summary Judgment (the "SJ Motion").[11]   This SJ Motion is specifically addressed to the copyright claims only (the First, Second, and Third Claims for Relief), and is only necessary if those claims survive the Motion to Dismiss.   The SJ Motion argues, in essence, that even if Plaintiffs can sufficiently allege ownership of valid copyrights so as to survive dismissal on the Motion to Dismiss, there is insufficient evidence of similarity between the allegedly copyrighted materials and the film "The Peacemaker" for the question to be submitted to a jury.   See SJ Motion at 2-4.   The SJ Motion was also noticed for a hearing on March 12, 2001, to be heard along with the Motion to Dismiss previously filed by these Defendants.

On February 28, 2001, Plaintiffs filed a document titled "Request to Deny or Continue Defendants' Motion for Summary Judgment," in lieu of any opposition to the SJ Motion.[12]   This "Request" invokes Federal Rule of Civil Procedure 56(f).   Plaintiffs claim any grant of summary judgment is premature without allowing them discovery on, inter alia, earlier versions of the script for "The Peacemaker," a two-page pitch "treatment" for the movie that was allegedly crucial to development, the people who worked on the scripts and the film (such that they may be deposed), the contract, if any, between Defendants Dreamworks, the Cockburns, and Stern, and source materials that Defendant Spielberg allegedly gave to Defendant Schiffer (screenwriter).   The Dreamworks Defendants filed their Reply to this "Request" on March 5, 2001.

---

[11] Defendants sought, and the Court granted (February 20, 2001), leave to file an oversized memorandum of points and authorities.

[12] This document was rejected by the clerk for failure to file a proposed order under separate cover; the Court accepted the filing.

## II. LEGAL STANDARDS

### A.   Motion to Dismiss Pursuant to Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. See Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990). "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 969, 699 (9th Cir. 1988); accord Gilligan, 108 F.3d at 249 ("A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. See Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). Moreover, the complaint must be read in the light most favorable to plaintiff. See id. However, the Court need not accept as true any unreasonable inferences, unwarranted deductions of fact, and/or conclusory legal allegations cast in the form of factual allegations. See, e.g., Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

Moreover, in ruling on a 12(b)(6) motion, a court generally cannot consider material outside of the complaint (e.g., those facts presented in briefs, affidavits, or discovery materials). See Branch

1  *v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994).  A court may, however,

2  consider exhibits submitted with the complaint.  See *id.* at 453-54.

3  Also, a court may consider documents which are not physically attached

4  to the complaint but "whose contents are alleged in [the] complaint

5  and whose authenticity no party questions."  *Id.* at 454.  Further, it

6  is proper for the court to consider matters subject to judicial notice

7  pursuant to Federal Rule of Evidence 201.  *Mir, M.D. v. Little Co. of*

8  *Mary Hospital*, 844 F.2d 646, 649 (9th Cir. 1988).

9

10  **B.   Motion For a More Definite Statement Pursuant to Rule 12(e)**

11       A Rule 12(e) motion for a more definite statement is appropriate

12  where the allegations in the complaint are so vague or confusing that

13  the defendant(s) have substantial difficulty in framing a response.

14  The text of Federal Rule of Civil Procedure 12(e) provides:

15       If a pleading to which a responsive pleading is permitted is
         so vague or ambiguous that a party cannot reasonably be
16       required to frame a responsive pleading, the party may move
         for a more definite statement before interposing a
17       responsive pleading.

18  Fed. R. Civ. Pro. 12(e).  "A motion for a more definite statement

19  attacks unintelligibility in a pleading, not simply mere lack of

20  detail.  Thus, the motion fails where the complaint is specific enough

21  to apprise defendant of the *substance* of the claim being asserted."

22  Schwarzer, Tashima, & Wagstaffe, *Federal Civil Procedure Before Trial*

23  § 9:349 (2000) (emphasis in original) (citing, *inter alia*, *Bureerong*

24  *v. Uvawas*, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996)).  Due to the

25  liberal pleading standards and the availability of extensive discovery

26  under the Federal Rules of Civil Procedure, the availability of this

27  motion has been substantially restricted.  See *Famolare, Inc. v.*

28  *Edison Brothers Stores, Inc.*, 525 F. Supp. 940, 949 (E.D. Cal. 1981).

8

In general, the motion should not be granted unless the defendant cannot frame a responsive pleading.  See Boxall v. Sequoia Union High School District, 464 F. Supp. 1104, 1114 (N.D. Cal. 1979).  Thus, the motion's purpose is not to attack a complaint's "mere lack of detail." Beery v. Hitachi Home Elec.(America), Inc., 157 F.R.D. 477, 480 (C.D. Cal. 1993).  However, despite the fact that a Rule 12(e) motion is often described as "disfavored," the Court must ensure that the claims are not "so general that ambiguity arises in determining the nature of the claim or the parties against whom the claim is being made." Schwarzer, Tashima, & Wagstaffe, Federal Civil Procedure Before Trial § 9:354 (2000).  Therefore, Rule 12(e) motions are most often granted when the allegations in the complaint fail to properly describe all of the underlying events, agreements, or parties warranting its claims.[13]

## C.   Motion for Summary Judgment Pursuant to Rule 56

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."  Fed. R. Civ. Pro. 56(c); see British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978); Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co., 954 F. Supp. 1399, 1402 (C.D. Cal. 1997).

---

[13] See, e.g., Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream Inc., 1997 WL 108718, *5 (N.D. Cal. 1997) (granting 12(e) motion where complaint did not say whether contract at issue was oral or written); Erickson v. Kiddie, 1986 WL 544, *11 (N.D. Cal. 1986) (granting motion and requiring plaintiffs to either attach the underlying contracts or to allege "the dates the agreements were entered into, with who[m], by whom and specifically their terms"); Ortiz v. Bank of America, 1982 WL 502, *9 (E.D. Cal. 1982) (granting motion and noting that implicit in Rule 8 "is the notion that the complaint must be of sufficient clarity to enable the defendants to frame a responsive pleading").

1    If the moving party has the burden of proof at trial (e.g., a

2 plaintiff on a claim for relief, or a defendant on an affirmative

3 defense), the moving party must make a "showing sufficient for the

4 court to hold that no reasonable trier of fact could find other than

5 for the moving party." Calderone v. United States, 799 F.2d 254, 259

6 (6th Cir. 1986) (quoting from Schwarzer, Summary Judgment Under the

7 Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D.

8 465, 487-88 (1984)).  Thus, if the moving party has the burden of

9 proof at trial, that party "must establish beyond peradventure all of

10 the essential elements of the claim or defense to warrant judgment in

11 [its] favor." Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir.

12 1986) (emphasis in original); see Calderone, 799 F.2d at 259.

13    If the opponent has the burden of proof at trial, the moving

14 party has no burden to negate the opponent's claim. Celotex Corp. v.

15 Catrett, 477 U.S. 317, 323 (1986).  The moving party does not have the

16 burden to produce any evidence showing the absence of a genuine issue

17 of material fact. Id. at 325.  "Instead, . . . the burden on the

18 moving party may be discharged by 'showing'--that is, pointing out to

19 the district court--that there is an absence of evidence to support

20 the nonmoving party's case." Id. (citations omitted).

21    Once the moving party satisfies this initial burden, "an adverse

22 party may not rest upon the mere allegations or denials of the adverse

23 party's pleadings . . . [T]he adverse party's response . . . must set

24 forth specific facts showing that there is a genuine issue for trial."

25 Fed. R. Civ. Pro. 56(e) (emphasis added).  A "genuine issue" of

26 material fact exists only when the nonmoving party makes a sufficient

27 showing to establish the essential elements to that party's case, and

28 on which that party would bear the burden of proof at trial. Celotex,

1   477 U.S. at 322-23.  "The mere existence of a scintilla of evidence in

2   support of the plaintiff's position will be insufficient; there must

3   be evidence on which a reasonable jury could reasonably find for

4   plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252

5   (1986).  The evidence of the nonmovant is to be believed, and all

6   justifiable inferences are to be drawn in favor of the nonmovant.  Id.

7   at 248.  However, the court must view the evidence presented "through

8   the prism of the substantive evidentiary burden."  Id. at 252.

9       If the nonmovant is unable to create triable issues of material

10  fact, Federal Rule of Civil Procedure 56(f) permits summary judgment

11  to be denied or delayed to allow the nonmovant further discovery.  The

12  party seeking protection under subdivision (f) must state by affidavit

13  the reasons why he or she is unable to present the necessary opposing

14  material.  Further, "Rule 56(f) requires the nonmoving party to show

15  that additional discovery would uncover specific facts which would

16  preclude summary judgment."  Maljack Productions, Inc. v. Goodtimes

17  Home Video Corp., 81 F.3d 881, 888 (9th Cir. 1996).  The Rule 56(f)

18  "movant" must set forth specific needed facts, and must also specify

19  "how [those facts] would preclude summary judgment."  Garrett v. City

20  & County of San Francisco, 818 F.2d 1515, 1518 (9th Cir. 1987).

21      A "major objective" of Rule 56(f) is "to ensure" that "diligent"

22  parties are given a "reasonable" opportunity for discovery.  See 10B

23  Wright, Miller & Kane, Federal Practice and Procedure, Civil 3d § 2741

24  at 412 (1998).  Thus, a Rule 56(f) movant's failure to secure evidence

25  cannot result from a lack of diligence in discovery.  See, e.g., Nidds

26  v. Schindler Elevator Corp., 113 F.3d 912, 921 (9th Cir. 1996) ("the

27  district court does not abuse its discretion by denying further

28  discovery if the movant has failed diligently to pursue discovery.").

### III.   FACTUAL ALLEGATIONS[14]

Both the initial Complaint and the FAC include exhaustive and detailed descriptions of the materials at issue (e.g., Plaintiffs' allegedly copyrighted materials, the plot points of "The Peacemaker," and the comparisons between these two "stories") and the bases for Plaintiffs' claims that some or all of the Defendants are liable for appropriating Plaintiffs' works without compensation.  For purposes of the instant Motion to Dismiss, it is not necessary to repeat all of these allegations in the present order.  Instead, the Court provides only a brief summary of the basic outlines of Plaintiffs' claims.

Plaintiffs allege that this is a case "about the theft of the most valuable commodity in Hollywood. . . . a story . . ."  FAC ¶ 3. Plaintiffs claim that Defendants, as a "conspiratorial enterprise," acted together to "steal" Plaintiff Idema's "story," through various tellings of that "story" in allegedly copyrighted materials.  Id.[15]

---

[14] As required for a Rule 12(b)(6) motion, the Court accepts as true all material allegations in the FAC, as well as any reasonable inferences to be drawn from them.  See Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  The Court may disregard allegations in the FAC if they are contradicted by facts established by reference to any documents attached as exhibits, or upon which it necessarily relies; the Court also need not accept as true allegations that contradict facts judicially noticed by the Court.  See, e.g., Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994); Mullis v. United States Bankrupcy Court, 828 F.2d 1385, 1388 (9th Cir. 1987).  Neither of these actions would convert a motion to dismiss into a motion for summary judgment. See, e.g., Branch v. Tunnell, 14 F.3d at 454.  In that the Court has decided not to consider the motion for summary judgment at this time, it does not consider any of the evidence presented that is outside of the FAC and/or documents attached thereto.  See infra Part IV.B.

[15] Plaintiffs identify at least 10 separate allegedly copyrighted works of authorship which are collectively referred to as "Idema's Story," written by Morris, Idema, the Scurkas, or some combination.

Extracting the actual sequence of events from the verbose, prolix and redundant allegations in the FAC is no simple matter, but as far as the Court can tell, the basic background is as follows.  Plaintiff Idema is alleged to be a former Green Beret who, during the so-called "Lithuanian revolution" in 1991 was working in that country as what Plaintiffs term a "civilian advisor,"[16] helping to train Lithuanians (and others) for their struggle to break away from the Soviet Union. See FAC ¶¶ 42-46.  Working together with former Soviet soldiers whom he befriended, Plaintiffs allege that Idema was instrumental in the eventual development of the Lithuanian National Police.  During this time period, Idema also allegedly became aware that various factions were working to sell and/or smuggle "the single most valuable resource of the Soviet Union-nuclear weapons and nuclear materials."  FAC ¶ 42.

Idema and his allies allegedly worked to uncover evidence of the purported plans to smuggle former Soviet nuclear weapons.  Yet when Idema was allegedly approached by officials of the U.S. government in late 1992 who sought to capitalize on his contacts, Idema allegedly refused to divulge the names of his sources for fear that all of the agencies in question (e.g., the FBI and CIA) had been "infiltrated" by (former) Soviet KGB intelligence operatives.  See FAC ¶ 52.  According to Idema, this refusal to cooperate with U.S. agencies rendered him "persona non grata" with those agencies.  He was subsequently charged and prosecuted for various undisclosed offenses, and allegedly spent four years in various state and federal prisons.  See FAC ¶¶ 53-55. His plight allegedly "sparked intense debates" by policymakers.  Id.

---

[16] Whether Idema was doing so on authority of the United States government is entirely unclear, given his "civilian advisor" status.

13

Plaintiffs allege that sometime in 1994 and 1995, work began on several versions of "Idema's Story," by various of the Plaintiffs both alone and in combination with one another.[17] Though it is not clear when and how each of these documents was written, the "works" that Plaintiffs identify as the various encapsulations of "Idema's Story" include several articles and film treatments allegedly penned by Jim Morris, all but one with the words "Loose Cannon" in the title,[18] a film treatment called "The Vilnius Brief" written by Plaintiff Gary Scurka, another film treatment called "Any Lesser Man: The Keith Idema Story," also written by Plaintiff Scurka, and finally a fictionalized partial account of Plaintiff Idema's life, allegedly written by Idema himself, called "Red Bull Rising." See FAC ¶¶ 4, 20. Each Plaintiff claims a copyright interest in all of these works, by virtue either of authorship or assignment of rights to one another. See FAC ¶ 21.

Plaintiffs claim that "Idema's Story," and/or the various written treatments of that story, were the inspiration for "The Peacemaker," a film starring George Clooney and Nicole Kidman that was released by Dreamworks in 1997. Plaintiffs claim that the "obvious" similarities between "Idema's Story" and "The Peacemaker" manifest infringement.

---

[17] Among those who have allegedly expressed interest in "Idema's Story," and are allegedly helping Plaintiff Idema to write a novel or other fictionalization of his story, is Robin Moore, alleged to be the author of the well-known book The Green Berets. See FAC ¶¶ 58-59. Moore is not included among the Plaintiffs in this civil action.

[18] These include "Loose Cannon: The Keith Idema Story," a 20-page movie treatment written by Plaintiff Morris, "Loose Cannon on Target," an article published in the March 1995 edition of Soldier of Fortune magazine by Plaintiff Morris, "Spiking a Loose Cannon," an article in the April 1995 edition of Soldier of Fortune by Plaintiff Morris, and "Cool-Hand Keith," an article published in the September 1997 edition of Soldier of Fortune by Plaintiff Morris (photos by Plaintiff Idema).

1    Specifically, Plaintiffs allege that the Dreamworks Defendants,
2    as well as the Cockburns, became aware of "Idema's Story" in various
3    ways, and then "conspired" to "steal" that story.  Plaintiffs allege
4    that sometime in 1994 or early 1995, the Scurkas "shopped" the "real"
5    version of Idema's Story (and "clip reels" related thereto) to various
6    news organizations, including CBS News, Frontline, CBS' 60 Minutes,
7    and ABC's 20/20.  It was allegedly through these activities that the
8    Cockburns (working for Frontline and/or 60 Minutes) became aware of
9    "Idema's Story."  See FAC ¶¶ 61, 89.  Plaintiffs also allege that at
10    various points the "treatments" of "Idema's Story" that they prepared
11    were submitted to Spielberg and/or the Dreamworks Defendants (or to
12    the predecessor to Dreamworks, Amblin Entertainment).  See FAC ¶¶ 65,
13    85, 104 (referring predominantly to Plaintiff Morris' works).  Other
14    versions of "Idema's Story" were also allegedly subsequently sent to
15    Spielberg and/or Dreamworks.  See FAC ¶¶ 66, 86, 98, 101, 105, 111
16    (referring primarily to "The Vilnius Brief" and "Red Bull Rising").

17    Plaintiffs claim that a book entitled One Point Safe, allegedly
18    written by the Cockburns, and upon which Plaintiffs allege Spielberg
19    and other Dreamworks Defendants have claimed "The Peacemaker" was in
20    part based, was just part of an elaborate "conspiracy" to cover up the
21    fact that "The Peacemaker" was actually based on "Idema's Story."  In
22    fact, Plaintiffs allege that the Dreamworks Defendants have claimed an
23    article by the Cockburns published in Vanity Fair as the "genesis" of
24    the film, but that no such article was ever published.  See FAC ¶ 92.
25    Plaintiffs claim that the origin of "The Peacemaker" cannot be traced
26    either to One Point Safe or to any Vanity Fair article, but instead is
27    found in the various documents making up "Idema's Story."  They claim
28    that One Point Safe was published merely to cover up this "theft."

1    Indeed, it is clear that Plaintiffs do not claim that <u>One Point</u>
2  <u>Safe</u> itself infringes their copyrights in "Idema's Story," as the FAC
3  explicitly states that "<u>One Point Safe</u> bears no resemblance to either
4  <u>Red Bull Rising</u>, Idema's Story, or <u>The Peacemaker</u> film."  FAC ¶ 137.
5  Instead, Plaintiffs appear to argue that the book was conveniently
6  published at or around the same time as the film was released (1997),
7  and that Random House, the Cockburns, and the Dreamworks Defendants
8  were engaged in some sort of conspiracy to suppress their <u>real</u> source.

9    Plaintiffs also claim that the Scurkas hired Defendant Petersen
10 as a consultant on their various projects involving Idema's Story.
11 <u>See</u> FAC ¶ 36.  They allege that the Scurkas sent copies of various
12 versions of Idema's Story to Defendant Petersen, along with copies of
13 secret Soviet/Russian documents, and that Petersen gave those copies
14 to Defendant Stern (then allegedly a White House employee), who then
15 passed them on to her next-door neighbors, the Cockburns, who in turn
16 gave or sold them to Spielberg/Dreamworks.  <u>See</u> FAC ¶¶ 57, 87, 206.
17 It is on these alleged transmissions of confidential materials that
18 Plaintiffs apparently base claims for Breach of Contract (Sixth Claim
19 for Relief) by Defendant Petersen, for Civil Conspiracy (Eighth Claim
20 for Relief) by the Dreamworks Defendants (i.e., Dreamworks entities,
21 Spielberg, the Cockburns, Schiffer, and Stern) and by Bantam/Random
22 House, for Conversion (Ninth Claim for Relief) by all Defendants, and
23 for alleged RICO violations (Tenth Claim for Relief) by the Dreamworks
24 Defendants (Dreamworks entities, Spielberg, the Cockburns, and Stern).
25 <u>See</u> FAC ¶¶ 185-190, 199-236 (alleging these Claims for Relief).

26   Plaintiffs therefore claim that Defendants had various avenues of
27 "access" to "Idema's Story," that this story formed the basis for "The
28 Peacemaker," and that this "theft" was covered up by a "conspiracy."

16

## IV.  DISCUSSION

Currently pending before the Court are essentially <u>three</u> separate "Motions": the Motion to Dismiss, filed by the Dreamworks Defendants (and joined by all Defendants except Defendant Peterson); the Motion for Summary Judgment, also filed by the Dreamworks Defendants (an appellation now including all except Peterson and Random House), and joined by Defendant Random House; and Plaintiffs' "Motion" per Rule 56(f), seeking a denial or continuance of the SJ Motion so as to allow Plaintiffs additional time for discovery.  As will be made clear in the following discussion, the Court does not now decide the Motion for Summary Judgment, in that its decision(s) on the Motion to Dismiss render consideration of the SJ Motion (filed only for the contingency that the copyright claims might survive) unnecessary.  Hereunder, the Court GRANTS IN PART AND DENIES IN PART the Motion to Dismiss.

## A.  Defendants' Motion Pursuant to Rules 12(b)(6) and 12(e)

In what follows, the Court will first address the federal claims, and then, to the extent necessary, address the state law claims.  Most of these claims are addressed only under the Rule 12(b)(6) standard. Where appropriate, the Court also discusses Rule 12(e).

### 1.  The Copyright Infringement Claims (First, Second, and Third)

The FAC alleges three separate claims based on alleged unlawful copying of Plaintiffs' works of authorship by "The Peacemaker."  In addition to a straightforward claim of Copyright Infringement (First Claim for Relief), and a claim for Contributory Infringement (Second Claim for Relief), Plaintiffs also assert an apparently separate claim titled "Conspiracy to Infringe Copyright" (Third Claim for Relief).

1      The First Claim is asserted only against the Dreamworks entities,

2 and Defendants Spielberg, Schiffer, and the Cockburns.  The Second

3 Claim is asserted against Spielberg, Schiffer, the Cockburns, Stern,

4 and Petersen.  The Third Claim is asserted against "All Defendants

5 Except Petersen."  See FAC ¶¶ 147-162.  Each of these claims is based

6 upon the same basic factual allegations, and seeks equivalent relief.

7      Plaintiffs claim exclusive rights to various versions of "Idema's

8 Story," and to the "wholly original" material contained therein.  See,

9 e.g., FAC ¶ 148.  Plaintiffs then claim that the film "The Peacemaker"

10 is "undeniably derived" from "Idema's Story."  See, e.g., FAC ¶ 152.

11 Plaintiffs allege that the various Defendants accused in the First and

12 Second Claims are either directly or indirectly responsible for this

13 infringement.  See FAC ¶¶ 152, 155-156.  Finally, in the Third Claim,

14 Plaintiffs assert that a "conspiracy" which "started with Spielberg,

15 Stern, and the Cockburn defendants, and eventually grew to include all

16 defendants, except Petersen," was formed to accomplish or cover up the

17 infringement of Plaintiffs' copyrighted works.  FAC ¶ 159.  Plaintiffs

18 seek compensation, a "fair opportunity to publish" their own "Idema's

19 Story," and "appropriate recognition."  See, e.g., FAC ¶ 153.

20      In the Motion to Dismiss, Defendants argue that the Court has no

21 jurisdiction to hear Plaintiffs' copyright claims, because Plaintiffs

22 have failed to allege "registration" of the allegedly protected works

23 sufficiently to satisfy the copyright statutes.  Defendants argue that

24 17 U.S.C. § 411(a) requires Plaintiffs to allege/show receipt of a

25 "certificate of registration," not just an "application" therefor.  In

26 the alternative, Defendants argue that even if only an "application"

27 is required, the FAC fails to clearly allege for which of the versions

28 of "Idema's Story" applications were submitted.  See Motion at 9-13.

1    Plaintiffs respond that they have complied with, and alleged this

2  compliance with, all requirements for "registration" of copyright, as

3  to each of the versions of "Idema's Story," in that they (1) submitted

4  a copyright application for each, (2) paid the statutory fee(s), and

5  (3) provided a "deposit copy" of each work to the Copyright Office.

6  As FAC Exhibit A, Plaintiffs attached "Receipts" from the Copyright

7  Office showing registration applications for "Loose Cannon - The Keith

8  Idema Story" (Film Treatment) by Morris and Idema,[19] for "Red Bull

9  Rising" by Idema (Book Manuscript), and for "Any Lesser Man - The

10  Keith Idema Story" by the Scurkas and Idema (Film Treatment/video),[20]

11  and a Certificate of Registration showing grant of a "registration" of

12  copyright as to the first of these: "Loose Cannon - the Keith Idema

13  Story" (Reg. No. Pau 2-510-608).  The applications were only submitted

14  on September 21, 2000,[21] just four days prior to Plaintiffs' filing of

15  the initial Complaint, and three to six years after each was written.

16

17         [19] It is not entirely clear what is covered by this application,

18  in that it only appears to have been filed with specific regard to the
   actual film treatment, but also references in the "Notes" section the

19  existence of three other related documents which may have been filed
   along with the film treatment: "Loose Cannon Articles - Part 1 & Part

20  2"; "Loose Cannon Article - Unpublished Article"; and "Cool-Hand Keith

21  - SOF".  Presumably, these articles were not included in the copyright
   "application."  This is confirmed by the actual Certificate for "Loose

22  Cannon - The Keith Idema Story" (Reg. No. PAu 2-510-608), also part of
   Exhibit A, which describes only the "film treatment" as the subject of

23  the registration, and lists as "previous or alternative titles" "The
   Keith Idema Story"; "Loose Cannon on Target"; and "Spiking a Loose

24  Cannon."  Thus, it appears that the "articles" are not included.

25         [20] No proof of an application for "The Vilnius Brief" is included

26  in Exhibit A, aside from a reference thereto in the "Receipt" as to
   "Any Lesser Man - The Keith Idema Story" by the Scurkas and Idema.

27
           [21] Similarly, the "effective date" for the Certificate issued for

28  "Loose Cannon - The Keith Idema Story" is indicated as "9/21/00."

1   Attached to their Opposition to the Motion to Dismiss, Plaintiffs

2   also submit a Certificate of Registration for "The Vilnius Brief" that

3   confirms[22] that its application/"effective date" is also September 21,

4   2000.[23]  See Exhibit 1 to Opposition (Certification of Registration

5   for "The Vilnius Brief" (Reg. No. PAu 2-522-556)).  Thus, Plaintiffs

6   have Certificates of Registration only as to two of the allegedly

7   copyrighted works, but claim that where they allege application for

8   registration as to the others, the Court may assert jurisdiction.  See

9   Opposition at 9-11 (citing no authority in support of this theory).[24]

10   The basic question, therefore, is whether a copyright plaintiff

11   must be able to allege (and/or show) receipt of an actual Certificate

12   of Registration before institution of a copyright suit, or whether it

13   is enough that a plaintiff allege submission of an application: i.e.,

14   the three required steps of application, fee payment, and "deposit."

15   This turns out to be a complicated question, and one about which there

16   is no clear uniformity of opinion developed by the courts.

17

_____

18   [22] Therefore, Plaintiffs' apparent oversight in not including the

19   "Receipt" showing submission of an application for this "work" in the
     attachment to the FAC (Exhibit A) is remedied by this attachment.

20   [23] In that the "registration" of Plaintiffs' various copyrighted

21   works is clearly referenced in the FAC (e.g., FAC ¶ 20) (and it is
     clearly Plaintiffs' intent to include the proof of application as part

22   of Exhibit A, which may be considered as an "attachment" to the FAC),
     it is proper to treat this additional documentation as if it is "part"

23   of the FAC, and within the scope of consideration under Rule 12(b)(6).
     See, e.g., Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994).

24

25   [24] Plaintiffs also re-submit the Certificate of Registration for
     "Loose Cannon - The Keith Idema Story" (Reg. No. Pau 2-510-608) as an

26   exhibit to their Opposition.  In addition, Plaintiffs attach what is
     purported to be a publication from the Register of Copyrights as to

27   the amount of time it may take for a Certificate to issue (up to eight
     months), and describing the "effective date" as the date of receipt.

28   This material does not add anything to the Court's own analysis.

1    Defendants argue that in the absence of an actual Certificate of

2 Registration as to each allegedly copyrighted work, this Court has no

3 jurisdiction to hear a copyright claim based on that work.  Defendants

4 base this argument on 17 U.S.C. § 411(a), which provides, inter alia:

5       [N]o action for infringement of the copyright in any United
        States work shall be instituted until registration of the
6       copyright claim has been made in accordance with this title.
        In any case, however, where the deposit, application, and
7       fee required for registration have been delivered to the
        Copyright Office in proper form and registration has been
8       refused, the applicant is entitled to institute an action
        for infringement if notice thereof, with a copy of the
9       complaint, is served on the Register of Copyrights.

10 Relying on this section, and cases in which it is applied, Defendants

11 argue that "a plaintiff's failure to plead copyright registration

12 deprives the court of subject matter jurisdiction over a copyright

13 claim, and requires dismissal of that claim."  Motion at 10.  Here,

14 Defendants apparently argue that Plaintiffs have failed to allege the

15 "registration" of those works for which no Certificate was received.

16    Defendants are quite right that copyright "registration" is a

17 jurisdictional prerequisite to a copyright suit.  See, e.g., Dielsi v.

18 Falk, 916 F. Supp. 985, 994 (C.D. Cal. 1996)(citing cases); Hagendorf

19 v. Brown, 699 F.2d 478, 480 (9th Cir. 1983).[25]  However, as Defendants

20 also acknowledge, this truism does not end the inquiry.  The Court

21 must determine whether the registration requirement is satisfied only

22 by actual receipt (or denial) of the Certificate of Registration, as

23 Defendants argue, or whether it is also satisfied by simply submitting

24 applications therefor to the Copyright Office, as Plaintiffs allege.

25 //

26 _____

27    [25] Furthermore, 17 U.S.C. § 412 makes clear that a plaintiff may
   not be awarded statutory damages or attorneys' fees for any alleged
28 infringement occurring prior to the effective date of "registration."

21

1    As the Court has already indicated, there is no clear balance of

2 authority on this question.  Opinions from courts that have considered

3 the question are clearly split on what the "registration" requirement

4 entails.[26]  There is no Ninth Circuit authority clearly addressing the

5 particular point now raised by 17 U.S.C. § 411(a)(added in 1976).[27]

---

7    [26] The cases which have found that an actual Certificate must be
received prior to suit include M.G.B. Homes, Inc. v. Ameron Homes,
8 Inc., 903 F.2d 1486, 1488-89 (11th Cir. 1990), Int'l Trade Mgmt., Inc.
v. United States, 553 F. Supp. 402, 402-03 (Cl. Ct. 1982), Goebel v.
9 Manis, 39 F. Supp. 2d 1318, 1320-21 (D. Kan. 1999), Gerig v. Krause
Publications, Inc., 33 F. Supp. 2d 1304, 1305-06 (D. Kan. 1999), Ryan
10 v. Carl Corp., 1998 WL 320817, *1-3 (N.D. Cal. 1998), Nat'l Assoc. of
Freelance Photographers v. Assoc. Press, 1997 WL 759456, *12 (S.D.N.Y.
11 1997), Damiano v. Sony Music Entertainment, Inc., 975 F. Supp. 623,
634-35 (D.N.J. 1996), Ashlar v. Structural Dynamics Research Corp., 36
12 U.S.P.Q.2d 1402, 1405-04 (N.D. Cal. 1995), and Miller v. CP Chemicals,
Inc., 808 F. Supp. 1238, 1241-42 (D.S.C. 1992).  Conversely, cases in
13 which application was deemed sufficient include Lakedreams v. Taylor,
932 F.2d 1103, 1108 (5th Cir. 1991), Apple Barrel Prods. Inc v. Beard,
14 730 F.2d 384, 386 (5th Cir. 1984), Wilson v. Mr. Tee's, 855 F. Supp.
679, 682 (D.N.J. 1994), Tang v. Hwang, 799 F. Supp. 499, 503 (E.D. Pa.
15 1992), Tabra Inc. v. Treasures de Paradise Designs Inc., 20 U.S.P.Q.2d
1313, 1318 (N.D. Cal. 1991), Secure Svcs. Technology, Inc. v. Time and
16 Space Processing Inc., 722 F. Supp. 1354, 1363-64 (E.D. Va. 1989), and
Sebastian Int'l Inc. v. Consumer Contact (Pty) Ltd., 664 F. Supp. 909,
17 912 (D.N.J.), vacated on other grounds 847 F.2d 1093 (3d Cir. 1988).

18    [27] The only arguably applicable Ninth Circuit authority is Roth
Greeting Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970), in
19 which the court, construing the 1909 Copyright Act (prior to the 1976
amendments), found that a copyright action could be "maintained" upon
20 the basis of a pending application.  See id. at 1108-09.  However, as
Judge Smith persuasively articulates in Ryan v. Carl Corp., 1998 WL
21 320817, *1 (N.D. Cal. 1998), Roth has little or no application to the
question of what constitutes "registration" sufficient for copyright
22 jurisdiction under the present Copyright Act, given different language
in the 1909 Act, and provisions of the present statute that were not
23 included in the prior Act interpreted in Roth.  Moreover, given that
the Roth court gave only summary consideration to this question, that
24 the court largely assumed that a pending application constituted the
"registration" of the copyright, and the age of the Roth opinion, this
25 Court will not rely on Roth as expressing the inclination of the Ninth
Circuit as to the meaning of "registration" under 17 U.S.C. § 411(a).
26                                                    (continued...)

22

1    In a previous case, this Court assumed in passing that filing an
2  application would alone be sufficient to satisfy the Section 411(a)
3  requirement, at least for purposes of injunctive relief. See Dielsi,
4  916 F. Supp. at 994 n.6.[28] However, in that case the Court was not
5  forced to directly confront the issue with which it is now faced, as
6  the Dielsi plaintiff had not even submitted an application to the
7  Copyright Office prior to filing suit, let alone received therefrom
8  any Certificate(s) of Registration evidencing valid copyright. Thus,
9  this Court's conclusion in Dielsi that an application was on its own
10 sufficient "registration" to "institute" suit was unnecessary to the
11 outcome of that order, and thus constitutes dicta. Nonetheless, the
12 Court does note its prior published conclusion on this question.

13    In spite of that prior published opinion, however, the Court is
14 now of the opinion that the current language of the Copyright Act is
15 designed to forestall commencement of suit until such time as there
16 has been either an issuance of a Certificate of Registration, or the
17 affirmative denial of such "registration," by the Copyright Office.
18 Thus, a claim cannot be based merely on the filing of an application.
19 To the extent that Dielsi reached an opposite conclusion, therefore,
20 the Court now repudiates that portion of its prior opinion.

21

22    [27](...continued)
   To the extent that any case law does indicate the current thinking of
23 the Ninth Circuit (which has, somewhat surprisingly, apparently not
   weighed in on this question), this Court might be better served by
24 noting the opinion by Judge Kozinski (now of the Ninth Circuit, at the
   time Chief Judge of the U.S. Claims Court) finding that a Certificate
25 is necessary to "institute" a copyright suit. See Int'l Trade Mgmt.,
   Inc., 553 F. Supp. at 402-03 (applying 17 U.S.C. § 411(a)).
26

27    [28] In that opinion, the Court did note, however, that a plaintiff
   could not recover statutory damages or attorneys' fees absent receipt
28 of an actual "registration" (i.e., Certificate). See id.

23

1     The reasons for the Court's conclusion that "registration" under
2 Section 411(a) contemplates issuance (or denial) of a Certificate of
3 Registration by the Copyright Office are several.  First, and perhaps
4 most importantly, this is the meaning most obviously suggested by the
5 plain language of the statute.  Section 411(a) says that no copyright
6 action "shall be instituted" until a registration has been "made in
7 accordance with this title."  On its own, this does not necessarily
8 indicate one way or the other what "registration" means, but when it
9 is combined with the explicit allowance in the next sentence of this
10 provision that a claim may be instituted when an application has been
11 denied by the Copyright Office, it seems likely that "registration" in
12 the first part of this provision contemplates a grant thereof.

13     In other words, if "registration" in the first sentence of this
14 provision meant simply submission of an application to the Copyright
15 Office, the second sentence of this provision would be superfluous, as
16 there would be no need to stipulate that a plaintiff may nonetheless
17 file a claim where the application has been denied.  If "registration"
18 by mere application were enough, this would also encompass those cases
19 in which that application is later denied by the Copyright Office.  It
20 seems most likely that Section 411(a) contemplates that a copyright
21 suit may not be "instituted until registration of the copyright claim
22 has been made . . . [or] has been refused."  17 U.S.C. § 411(a).  In
23 short, the jurisdictional prerequisite of "registration" may be met
24 only by issuance of a Certificate of Registration, or denial thereof.
25 See, e.g., M.G.B. Homes, Inc., 903 F.2d at 1488-89; Int'l Trade Mgmt.,
26 Inc., 553 F. Supp. at 403; Robinson v. Princeton Review, Inc., 1996 WL
27 663880, *7-8 (S.D.N.Y. 1996); Ryan, 1998 WL 320817 at *2-3.
28 //

Other sections of the Copyright Act also confirm this analysis.
For instance, Section 410 thereof makes clear that "registration" of
any copyright is only completed once the Copyright Office has examined
an application and determined that a work is copyrightable as well as
properly filed.  See 17 U.S.C. § 410(a) ("When, after examination, the
Register of Copyrights determines that . . . the material deposited
constitutes copyrightable subject matter and that the other legal and
formal requirements of this title have been met, the Register shall
register the claim and issue . . . a certificate of registration")
(emphasis added); 17 U.S.C. § 410(b) (authorizing refusal where work is
not copyrightable or the "claim is invalid for any other reason"); 17
U.S.C. § 410(d) ("The effective date of . . . registration is the day
on which an application, deposit, and fee, *which are later determined
by the Register of Copyrights or by a court of competent jurisdiction*
to be acceptable for registration, have all been received . . .")
(emphasis added).  Thus, although the "effective date" of registration
is "back-dated" under 17 U.S.C. § 410(d) to the date of application,
the "registration" only becomes effective upon examination by the
Copyright Office (or by a federal court).  See 17 U.S.C. § 410(d).[29]

---

[29] As one court has put it, in discussing Section 410(a) and (d):
"Section 410(a)'s requirement of 'examination' would be meaningless if
filing and registration were synonymous.  The statute thus clearly
distinguishes between 'registration' and 'application,' requiring the
former as a prerequisite . . ." Robinson, 1996 WL 663880 at *7.  The
court also rejected plaintiff's argument that, because "registration
occurs *nunc pro tunc*" under 410(d), this is "tantamount to legislative
equation of an application with registration."  "The obvious flaw in
this argument . . . is that the relation back . . . says nothing about
what constitutes registration.  Indeed, this argument lends cogent
support to . . . the distinction between application and registration,
as there would be no need to relate the date of registration back to
the date of application if the two were synonymous."  Id.

1    Similarly, the provision in Section 410(c) that a <u>certificate</u> of
2  registration "made" within five years of the first publication of the
3  copyrighted work constitutes prima facie evidence of the validity of
4  that copyright suggests, by its proximal references to a <u>Certificate</u>
5  of Registration, and to that Certificate being "made," that the term
6  "made" in Section 411(a) also refers to the certificate itself.   In
7  other words, in order to meet the Section 411(a) requirement that
8  registration be "made" in accordance with the Copyright Act, Section
9  410(c) suggests that issuance of an actual certificate is required.

10    Secondly, section 410(c) also suggests a strong suggestion that a
11  Certificate of Registration is a prerequisite to maintenance of any
12  suit based on alleged copyright infringement: the certificate itself
13  constitutes prima facie evidence of validity of the copyright (if it
14  is issued within five years of first publication).  Without recourse
15  to this prima facie proof, a copyright plaintiff would be required to
16  <u>prove</u> the validity of his or her claimed ownership of the work.   The
17  resulting multiplication of required proof would be substantial.

18    If copyright plaintiffs were routinely allowed to bring claims
19  based merely on applications to the Copyright Office, this would mean
20  that in all of those cases the plaintiffs would be required to <u>prove</u>
21  the validity of their alleged copyrights.  This seems contrary to the
22  purpose of Section 410(c), which is clearly designed to reduce this
23  requisite proof by allowing the Certificate of Registration to stand
24  in for proof of validity.  The overall effect of Section 410(c) would
25  be substantially diminished by allowing suits to proceed in this way.
26  Moreover, this would introduce substantial additional problems as to
27  what courts do about "validity" during that period of time between
28  filing of the application and eventual issuance of a Certificate.

1    Thirdly, the Court finds more persuasive that authority which has

2  found that the Copyright Act contemplates forestalling of copyright

3  claims until such time as an actual Certificate of Registration has

4  been issued than that which has found that it does not.  As an initial

5  matter, the Court notes that most or all of the cases finding that an

6  application is sufficient for copyright jurisdiction have directly or

7  indirectly relied on the Fifth Circuit opinion in Apple Barrel Prods.,

8  Inc v. Beard, 730 F.2d 384, 386 (5th Cir. 1984).[30]  The Apple Barrel

9  court, in turn, relied exclusively on language in Nimmer on Copyright,

10  without indicating from whence Nimmer extracted this conclusion.  See

11  id. at 387 (citing 2 Nimmer on Copyright § 7.16[B][1] (no date)).[31]

12    More importantly, the Court does not find that any of the cases

13  permitting institution of suit based on a mere application provides a

14  compelling interpretation of the statute (or other reasoning).[32]

15  _____

16    [30] One notable exception to this general rule of reliance on the
   Apple Barrel opinion is Tabra Inc. v. Treasures de Paradise Designs
17  Inc., 20 U.S.P.Q.2d 1313, 1318 (N.D. Cal. 1991), in which Judge Patel
   held without citation to legal authority that the term "registration"
18  should not be considered synonymous with the term "certificate."

19    [31] This is the same authority upon which this Court relied in its
   conclusion in Dielsi that an application was sufficient.  See Dielsi,
20  916 F. Supp. at 994 n.6 (citing Nimmer on Copyright § 7.16[B][1] n.39
   (no date)).  The current version of this treatise continues to suggest
21  application is enough for "registration" of a copyright, now citing,
   inter alia, the Dielsi opinion in support of this proposition.  See 2
22  Nimmer on Copyright § 7.16[B] n.39 (2000) (citing Dielsi, 916 F. Supp.
   at 994 n.6); see also id. § 7.16[B][1][a] n. 48.2 (citing, inter alia,
23  the Apple Barrel opinion in support of the availability of at least
   injunctive relief even in the absence of a Certificate).  The treatise
24  also indicates on a later page that "some courts" have determined that
   a registration Certificate is necessary.  See 2 Nimmer on Copyright §
25  7.16[B][1][a] n.55 (2000) (citing some of the cases listed above).
26

27    [32] The only cited case in which the court articulated a rationale
   is Secure Services Technology, Inc. v. Time and Space Processing, Inc,
28                                                      (continued...)

1       This is in sharp contrast to the cases finding that a Certificate

2   of Registration is a prerequisite.  Most notable in this respect are

3   Int'l Trade Management, Inc. v. United States, 553 F. Supp. 402, 403

4   (Cl. Ct. 1982), in which Judge Kozinski persuasively argues that it

5   was Congress' intent to have the Copyright Office issue a decision on

6   the validity of a copyright prior to institution of a suit, and Ryan

7   v. Carl Corp., 1998 WL 320817, *2-3 (N.D. Cal. 1998), in which Judge

8   Smith closely reads the statute to require that the Copyright Office

9   have the first "crack" at assessing copyright applications.[33]

10  //

11

12      [32](...continued)
    722 F. Supp. 1354, 1364 (E.D. Va. 1989), in which the court noted that

13  "[w]ere the law otherwise, the owner of a copyright would be left in
    legal limbo while the Copyright Office considers whether he qualifies

14  for a certificate of registration."  However, the Court does not find
    this "legal limbo" necessarily inconsistent with the Copyright Act.

15  Indeed, the Court notes that it actually seems most consistent with
    the administrative procedures set up by the Act for courts to wait for

16  a preliminary administrative finding as to validity of a copyright
    before embarking on their own analysis.  This is consistent with the

17  requirement that purported copyrights must be registered at all, and

18  also with the provision that a Certificate is prima facie evidence of
    the validity of the copyright for which it is issued.

19

20      [33] The Court notes that the Eleventh Circuit has joined the ranks
    of those courts requiring a Certificate of Registration.  See M.G.B.

21  Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1488-89 (11th Cir.
    1990).  Also notable are two recent opinions from Judge Marten of the

22  District Court of Kansas, usefully summarizing the case law on this
    issue, and explicitly rejecting the Apple Barrel holding.  See Goebel

23  v. Manis, 39 F. Supp. 2d 1318, 1320-21 (D. Kan. 1999); Gerig v. Krause
    Publications, Inc., 33 F. Supp. 2d 1304, 1305-06 (D. Kan. 1999).  The

24  Court also finds persuasive Judge Cote's opinion in Nat'l Assoc. of
    Freelance Photographers v. Assoc. Press, 1997 WL 759456, *12 (S.D.N.Y.

25  1997), particularly its discussion and rejection of Apple Barrel, and

26  its indication that other judges in the Southern District of New York
    also demand a Certificate.  See, e.g., Robinson, 1996 WL 663880 at *7,

27  in which Judge Kaplan also notes that in 1993 Congress considered and
    rejected a repeal of § 411(a) which would have permitted copyright

28  infringement suits merely upon submission of an application.

Finally, the Court notes that inasmuch as the mere existence of a registration requirement before institution of a lawsuit, as well as the prima facie weight given to a Certificate of Registration (issued within five years of first publication), evince Congress' intent to encourage owners of copyrights to register those works of authorship with the Copyright Office, this purpose of the Act is best furthered by requiring that plaintiffs acquire a Certificate of Registration before instituting (or continuing) suit.[34]  If plaintiffs were in the usual case allowed to pursue a copyright claim based merely on filing an application with the Copyright Office, there would be no incentive to file promptly upon authorship.  Copyright plaintiffs would in essence be able to wait until just prior to filing suit to register, and by so doing frustrate the "notice" purpose of "registration."[35]

//

//

//

//

//

---

[34] Further support for the importance of the initial examination by the Copyright Office is provided by those cases which hold pursuant to Section 410 that an invalid Certificate, or one which was acquired by means of misleading the Copyright Office, is sufficient basis to dismiss a copyright claim brought thereon.  See, e.g., S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1086 (9th Cir. 1989)(noting that "fraud" on the Copyright Office may bar enforcement of valid copyrights).

[35] The Court notes that Plaintiffs in this case delayed at least three and more likely six years (the two Certificates of Registration that have been issued indicate "1994" dates of authorship) in filing their registration materials as to the materials constituting "Idema's Story."  Plaintiffs may not now be heard to complain that they may be faced with a significant period of waiting for the Copyright Office to act on those applications for which no response has yet been received, when it was they who delayed several years in seeking to register.

1   In any case, a Certificate of Registration (or a denial thereof)

2   is a jurisdictional prerequisite under the statute, and Plaintiffs

3   have not met that requirement as to the bulk of the materials on which

4   they now base their copyright claim(s).   Therefore, the Court has no

5   alternative but to find it has no jurisdiction to hear Plaintiffs'

6   copyright claims to the extent that they are founded on any allegedly

7   copyrighted work aside from the two for which Certificates have been

8   submitted (e.g., the "Loose Cannon" film treatment and the "Vilnius

9   Brief" film treatment).[36]   Furthermore, it is impossible to extract

10  these two "versions" of the various texts that make up "Idema's Story"

11  from that compilation from which Plaintiffs claim Defendants illicitly

12  borrowed.   The Court is therefore left to conclude that there is no

13  clear basis for it to assert jurisdiction under the Copyright Act over

14  Plaintiffs' copyright claim(s) as pled; it is not clear from the FAC

15  whether Plaintiffs could possibly state these claims based solely on

16  the two works for which Certificates have issued.   Moreover, pursuant

17  to Rule 12(e), the copyright claims are now so unintelligible that

18  Defendants cannot be expected to frame a response.   Accordingly, the

19  Court DISMISSES the First and Second Claims, with leave to amend (the

20  Third Claim is separately addressed below) under defined conditions.

21

---

22  [36] The Court does note authority suggesting the possibility that
    under certain very limited circumstances, a Certificate or denial may
23  not be required.   Some cases have found, for instance, that where an
    application has been timely filed, but not acted on by the Copyright
24  Office, and where a plaintiff seeks preliminary injunctive relief for
    which timeliness is an issue and the lack of a Certificate is through
25  no fault of the plaintiff's, a court may nonetheless be able to assert
    jurisdiction for the limited purpose of preliminary injunctive relief.
26  See, e.g., Olan Mills Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th
27  Cir. 1994); Robinson, 1996 WL 663880 at *8.   No such circumstance is
    presented by this case, but the Court leaves open this narrow possible
28  exception for consideration in an appropriate case.

Given the unusual circumstances of this case, in which two of the allegedly copyrighted works are sufficiently "registered" to warrant copyright jurisdiction, while the bulk of them are not, Plaintiffs have two options.  They may either choose to proceed immediately with the case, and amend their copyright claim(s) to be based only on the two works for which Certificates have been issued, or they may choose to wait until such time as the Copyright Office has acted on all (or more) of their applications, and then re-file the copyright claims when some "critical mass" of Certificates are received.  Under this latter "option," Plaintiffs' copyright claims (and the entire case, as indicated below) would be dismissed, without prejudice, and Plaintiffs would be required to re-file this case at a later date.  Conversely, under the first option, the case (and the case number) would remain "alive" pending Plaintiffs' timely amendment thereto.

Therefore, the Court hereby ORDERS Plaintiffs, if they desire to amend their copyright claims to be based exclusively on copyrighted works for which Certificates of Registration have issued, to file a Second Amended Complaint ("SAC") by no later than **April 23, 2001**.[37] The SAC may not base its copyright claims on any allegedly copyrighted works for which no Certificates of Registration have been issued.

Alternatively, Plaintiffs may simply wait until such time as more of the applications to the Copyright Office have been acted on, and decline to amend at this time.  If no SAC complying with this Order is filed by April 23, 2001, Plaintiffs' (First and Second) copyright claims will be dismissed, without prejudice, for lack of jurisdiction.

---

[37] Pursuant to Plaintiffs' request at oral argument, the deadline for filing the SAC was extended from April 2, 2001 to April 23, 2001.

**2.   Conspiracy to Infringe Copyright (Third Claim for Relief)**

Plaintiffs' Third Claim, for "Conspiracy to Infringe Copyright," alleges an open-ended "conspiracy" which had as its apparent goal the same ultimate end of infringing Plaintiffs' copyrights as is alleged under the first two Claims for Relief.  The Third Claim for Relief is alleged against all Defendants except Petersen.  See FAC ¶¶ 158-162. The "object" of the conspiracy was the theft of "Idema's Story."

Plaintiffs have offered, and the Court has found, no authority suggesting that such a cause of action exists under federal law.  In fact, at least one court has said that "there is no distinct cause of action for conspiracy under the Copyright Act."  Calloway v. Marvel Entertainment Group, 1983 WL 1152, *5 (S.D.N.Y. 1983).  Plaintiffs will not be permitted to "plead around" the specific limits placed on liability for copyright infringement by the Copyright Act by creating a new cause of action from whole cloth.  The Copyright Act already provides means for liability for vicarious and contributory infringers (as evidenced by Plaintiffs' Second Claim for Relief).

Any claim for "conspiracy to infringe copyright," to the extent it might be based on state law, would presumably also be preempted by the provisions for liability under the Copyright Act.  See, e.g., Hoey v. Dexel Systems Corp, 716 F. Supp. 222, 224 (E.D. Va. 1989).  In any case, any such claim based on state law would be redundant with the Eighth Claim for Relief (for "civil conspiracy").  This is evidenced by the fact that Plaintiffs, in their attempt to defend this Third Claim for Relief, titled "conspiracy to infringe copyright," refer primarily to the allegations underpinning the Eighth Claim for Relief.

For these reasons, the Court finds no basis for this cause of action.  Accordingly, the Third Claim is DISMISSED, with prejudice.

32

### 3.   Unfair Competition - Lanham Act (Fourth Claim for Relief)

Based on the same basic factual allegations underpinning their copyright claims, Plaintiffs also purport to state a claim against all Defendants under the federal Lanham Act (15 U.S.C. §§ 1117, 1125(a)). Plaintiffs claim that Defendants, inasmuch as their "conspiracy" to suppress the true origin of the story for "The Peacemaker" included a "based on" attribution of the film's story to the book One Point Safe (and/or to a "non-existent article") in its credits, "have made and will continue to make a false and misleading designation about the origin of this movie in violation of the Lanham Act . . ." FAC ¶ 166. In addition to this alleged "mis-attribution" in the film's credits, Plaintiffs point to a "medallion" which allegedly appears on the book jacket for One Point Safe, stating that the book is the "true story that inspired The Peacemaker, a major motion picture from DreamWorks Pictures." FAC ¶ 141; see FAC 167. Plaintiffs claim these "false designations" (and others allegedly made during promotion of the film) are actionable under the Lanham Act, in that they deceived the public as to the true origin of the story comprising "The Peacemaker," and by so doing compromised Plaintiffs' ability to capitalize thereon.

It seems fairly clear that Plaintiffs have merely attempted to re-state their copyright claims in another form under the guise of the federal Lanham Act. At heart, this separately-pled claim alleges, as did the copyright claim(s), that Defendants are guilty of "stealing" Plaintiffs' "story," and of not giving Plaintiffs "credit" for their contributions to or authorship of the story of "The Peacemaker." To the extent that Plaintiffs are merely attempting to re-cast copyright allegations as "unfair competition" or "false designation" claims, these claims are preempted by Section 301 of the Copyright Act.

1    This common-sense conclusion is resoundingly supported by a clear

2  line of Ninth Circuit authority controlling just this circumstance.

3  See, e.g., Cleary v. News Corp., 30 F.3d 1255 (9th Cir. 1994); Summit

4  Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc., 7 F.3d

5  1434 (9th Cir. 1993); Shaw v. Lindheim, 919 F.2d 1353 (9th Cir. 1990);

6  Lamothe v. Atlantic Recording Corp., 847 F.2d 1403 (9th Cir. 1988).

7  Under these cases, to the extent that a plaintiff claiming a Lanham

8  Act violation based on "misattribution" of credit for authorship (or

9  design of a patent) states a cause of action at all, it is for what is

10  called "reverse passing off" or "reverse palming off."  See Cleary, 30

11  F.3d at 1260 ("'Reverse passing off' or 'reverse palming off' occurs

12  when a product is mislabeled to mask the creator's contribution.

13  Moreover, 'failure to attribute authorship to a co-author resulting in

14  only partially accurate designation of origin constitutes reverse

15  palming off within the ambit of Section 43(a).'").  These cases note

16  that it is possible to state a Lanham Act claim where a co-author is

17  not included, or where the "true" author is neglected altogether.

18    However, in part to avoid treading on the domain of copyright,

19  such that any copyright claim could also be re-stated as a Lanham Act

20  claim, the Ninth Circuit has set stringent requirements for any Lanham

21  Act claim premised on "reverse passing off."  "[T]he purpose of the

22  Lanham Act 'is to prevent individuals "from misleading the public by

23  placing their competitors' work forward as their own."'"  Cleary, 30

24  F.3d at 1261.  Under this rubric, the Ninth Circuit has consistently

25  held that to state a Lanham Act claim based on failure to give proper

26  authorship (or design) credit, the "product" transmitted to the public

27  must be a "bodily appropriation" of the plaintiff's work.  See Cleary,

28  30 F.3d at 1261; Summit, 7 F.3d at 1438; Shaw, 919 F.2d at 1364.

The phrase "bodily appropriation" has been most recently defined by the Ninth Circuit as meaning "the 'copying or unauthorized use of substantially the entire item.'" Cleary, 30 F.3d at 1261. Thus, it is not sufficient (as it might be under copyright) for there to exist "substantial similarity" between the alleged "true source" and that "product" which is alleged to include a "false designation of origin." In this case, for Plaintiffs to state a claim, "The Peacemaker" must be nearly identical to "Idema's Story." This limitation is consistent with the purpose and effect of the Lanham Act, which is designed to prevent consumer confusion (in this circumstance) through deletion or omission of the "true" producer/designer/author of an item/work, and substitution therefor of the name of the defendant(s). Where the products are "merely generally similar," no Lanham Act liability will lie. See Cleary, 30 F.3d at 1261 (limited to "slight modifications").

As Defendants point out, Plaintiffs have not (and cannot) allege that "The Peacemaker" is a "bodily appropriation" of any or all of the works comprising "Idema's Story." Whatever might be said about the possibility of "similarity" between these works and the film, it is clear that Plaintiffs do not claim, nor could they, that Defendants directly copied "substantially the entire[ty]" of their works, yet failed to give them credit when the film was produced.[37] In light of Plaintiffs' inability to allege facts sufficient to state a claim under the Lanham Act, the Fourth Claim is DISMISSED, with prejudice.

---

[37] Nor is the Court impressed by Plaintiffs' argument that their Lanham Act claim should not be preempted by the Copyright Act because there is some possibility that the Copyright Act would not provide an adequate remedy, in part because some of the materials from which "The Peacemaker" was allegedly derived are not copyrighted. See Opposition at 15-16. See, e.g., Summit, 7 F.3d at 1438 (finding that whether the subject materials are protected by patent or copyright is irrelevant).

1    **4.   The RICO Claim (Tenth Claim for Relief)**

2        The last of Plaintiffs' attempts to state a claim arising under

3    federal law is the Tenth Claim for Relief, which purports to bring a

4    cause of action under RICO (18 U.S.C. § 1961 et seq.).  This claim is

5    alleged against the Dreamworks entities, Spielberg, the Cockburns, and

6    Stern.[38]  See FAC ¶¶ 222-236.  Plaintiffs state, as the basis for this

7    claim, that these Defendants have violated the substantive provisions

8    of Sections 1962(c) and 1962(d) of the RICO statute(s) by, inter alia,

9    engaging in an "enterprise" comprised of an "association in fact" of

10   Dreamworks, Amblin Entertainment, Spielberg, Stern, and the Cockburns.

11   See FAC ¶¶ 223-224.  The alleged "racketeering activity" in which this

12   "association in fact" is said to have engaged are acts of mail fraud

13   (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1341), and/or bribery of

14   public officials and witnesses (18 U.S.C. § 201).  See FAC ¶ 225.  The

15   "pattern of racketeering activity" (incorporating by reference those

16   allegations underpinning the Eighth Claim, for "Civil Conspiracy") is

17   only vaguely alleged, as are the purported "predicate acts" of mail or

18   wire fraud, or bribery of a public official.  See FAC ¶¶ 231-234.

19       It is quite clear that Plaintiffs have failed to state a credible

20   RICO claim, for a host of reasons.  It is equally clear that they will

21   be unable to state such a claim based on amended allegations.  In this

22   second attempt at pleading, Plaintiffs have provided absolutely no

23   basis for such a cause of action.  Indeed, the FAC makes clear that no

24   such claim could possibly be stated based on the facts of this case.

25   Accordingly, for the reasons indicated below, Plaintiffs' Tenth Claim

26   for Relief, under RICO, is hereby DISMISSED, with prejudice.

27   _____

28       [38] As with most of the claims, Doe defendants are also alleged.

36

1     To state a claim under RICO, Plaintiffs must plead (1) conduct

2  (2) of an "enterprise" (3) through a "pattern" (4) of "racketeering

3  activity." See Howard v. America Online, Inc., 208 F.3d 741, 746 (9th

4  Cir. 2000). A "pattern" of "racketeering activity" means at least two

5  predicate acts occurring within ten years of one another; two acts are

6  necessary but not automatically sufficient. Finally, for the acts to

7  constitute a "pattern," there must be shown a relationship between the

8  predicates and also a threat of "continuing" activity. See id.; H.J.,

9  Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238-39 (1989).

10     First of all, as Defendants point out, Plaintiffs have wholly

11  failed to allege the elements/occurrences of the purported "predicate

12  acts" of mail fraud, wire fraud, or bribery. A RICO claim must allege

13  every essential element of each predicate act. For mail fraud, for

14  example, the claim must allege the "scheme or artifice to defraud,"

15  the specific mailing(s), specific intent, and the contemplated harm.

16  See Rakoff & Goldstein, RICO: Civil and Criminal Law and Strategy §

17  1.04[1] at 1-27 (2000). In addition, when the underlying predicate

18  acts sound in fraud, the essential elements must not only be alleged,

19  but must also be particularized, pursuant to Federal Rule of Civil

20  Procedure 9(b). See id. at 1-29; Howard, 208 F.3d at 748 (must plead

21  "indictable" acts of fraud); Allwaste, Inc. v. Hecht, 65 F.3d 1523,

22  1530 (9th Cir. 1995)(requiring particularized pleading under 9(b)).

23     Here, Plaintiffs have not identified any specific instances of

24  mailings or telephone calls made to further a fraudulent scheme, nor

25  have they even alleged what that "fraudulent scheme" might be. They

26  merely supply vague allegations that "on numerous occasions" some or

27  all of "the defendants" used the mails, telephones, or facsimiles for

28  "data and information" to further their "enterprise." See FAC ¶ 231.

1    Furthermore, the FAC does not even attempt to identify the basis
2    for its claimed "predicate act" of bribery of a public official.   At
3    no point do Plaintiffs identify any particular act of "bribery," let
4    alone plead the elements of bribery that would be required to make
5    this offense "indictable."   See 18 U.S.C. § 1961(1)(B) (any predicate
6    act of bribery, mail fraud or wire fraud must be "indictable").   Thus,
7    Plaintiffs have failed to sufficiently plead any "predicate acts."
8    Moreover, Plaintiffs admit that they will be unable to amend their
9    pleadings to meet Rule 9(b), based on the facts in their possession.[39]
10   On this basis alone, the RICO claim must be dismissed with prejudice.

11       Yet there are also additional reasons why Plaintiffs have failed
12   to state an adequate RICO claim.   For instance, Plaintiffs must also
13   allege a "pattern of racketeering activity," i.e., two or more related
14   predicate acts (committed within a ten year period) which "amount to
15   or pose a threat of continued criminal activity."   H.J. Inc., 492 U.S.
16   at 239; see also Durning v. Citibank Int'l, 990 F.2d 1133, 1138-39
17   (9th Cir. 1993); Richardson v. Reliance National Indemnity Co., 2000
18   WL 284211, *8-9 (N.D. Cal. 2000); Fed. Reserve Bank of San Francisco
19   v. HK Systems, Inc., 1997 WL 765952, *7-8 (N.D. Cal. 1997).

20   _____

21       [39] Plaintiffs argue they should be entitled to discovery on facts
     supporting a pleading of criminal fraud: "absent discovery, it would
22   be impossible to allege the time and place of these incidents, the
     specific details, or the specific perpetrator(s)."   Opposition at 35.
23   However, Plaintiffs fundamentally misunderstand the very purpose of
     Rule 9(b), which subjects fraud claims to a higher pleading standard
24   precisely because defendants cannot be expected to answer them without
     particularized pleading, and because plaintiffs must be discouraged
25   from making bald accusations of fraud without any sufficient factual
     basis to support such claims.   The point is that a fraud plaintiff
26   must be possessed of sufficient facts to support the claim prior to
     instituting suit, "absent discovery."   Plaintiffs' admission that it
27   would be "impossible" to amend their complaint to adequately plead
28   fraudulent "predicate acts" is fatal to their RICO claim thereon.

The form of "continuity" of the "pattern" of criminal activity alleged may be either "open-ended" (i.e., threat of continuing/future criminal activity) or "closed-ended" (i.e., a "pattern" of criminal activity over a "substantial period of time" involving a substantial numbers of separate actions, actors, victims, and activities). See, e.g., Allwaste, 65 F.3d at 1528-30. Here, Plaintiffs have failed to allege a sufficient "pattern of racketeering activity" under either an open-ended or a closed-ended theory. The predicate acts in this case are (non-specifically alleged) instances of mail fraud, wire fraud, and bribery purportedly engaged in by Defendants. Even if more than two "predicate acts" were alleged,[40] these alleged actions were taken in furtherance of what can only be said to be one "fraudulent scheme" to divest Plaintiffs of the value of their "story." Thus, the several alleged instances of mail and wire fraud must be assessed against the backdrop of a single alleged scheme, aimed at a single outcome.

In similar circumstances, the Ninth Circuit has repeatedly found that even allegations of several individual "acts" are insufficient to meet the "continuity" requirement of RICO. See, e.g., Durning, 990 F.2d at 1139 ("While defendants may have committed numerous related predicate acts, all of those acts arose from a single, isolated event: the distribution of the misleading Official Statement."); Medallion Television Enterprises, Inc. v. SelecTV of Cal., Inc., 833 F.2d 1360, 1363-64 (9th Cir. 1987); Jarvis v. Regan, 833 F.2d 149, 153 (9th Cir. 1987). Thus, to the extent that Plaintiffs' allegations fail to show "continuity" of the "pattern of racketeering," they are deficient.

---

[40] As has been indicated, Plaintiffs have actually admitted their inability to plead any predicate acts so as to survive dismissal.

Moreover, Plaintiffs do not specify any particular time period during which any alleged "pattern" of criminal activity (as opposed to the vague allegations underpinning the claim of a "civil conspiracy" from 1995 to 1998) supposedly took place. They fail to allege any specific "substantial" period of time, or a threat of "ongoing" acts of a criminal nature. In their Opposition, Plaintiffs point to vague allegations in the FAC that Defendants, "particularly Spielberg and DreamWorks . . . [have a] long-term policy and *modus operandi* whereby these two defendants steal intellectual property as a matter of business, and then embark on a pattern of obstruction and exhaustive litigation in order to deplete the resources of those persons with meritorious claims . . ." Opposition at 37 (quoting FAC ¶ 233). It is quite clear, however, that these allegations are plainly inadequate to support a "pattern" or "threat" of ongoing criminal activity, and it is further clear that Plaintiffs have absolutely no basis for this specious, unsupported claim asserted under the RICO statutes.

Yet another obstacle to Plaintiffs' RICO claim is their failure (and inability) to allege that the "association in fact" that they have identified constitutes an "enterprise" within the meaning of the RICO statutes. As the Supreme Court has explicitly stated, proof of an "enterprise" consists of "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). Plaintiffs have pleaded no "ongoing organization" of these Defendants, nor any allegations that the various members of the RICO "enterprise" "function as a continuing unit." Plaintiffs allege only a loose association of Defendants, and a chain of activities that bears no obvious relationship to any fraudulent "enterprise."

40

1     Plaintiffs' vague argument in Opposition that "[f]unctioning as a

2   continuing unit is not a prerequisite or even a requirement of an

3   associated-in-fact enterprise" is directly contrary to <u>Turkette</u>.  Nor

4   does any of the authority cited by Plaintiffs change this calculus.

5   <u>See</u> Opposition at 38-39.  Plaintiffs again fundamentally misunderstand

6   the pleading (and proof) requirements for a RICO claim.  Plaintiffs

7   must be able to plead and prove that the various Defendants joined an

8   "enterprise" consisting of an "association in fact" which was both

9   "ongoing" and "functioning as a continuing unit."  Plaintiffs have not

10  and cannot meet this requirement, as they have not even alleged two

11  "predicate acts" underpinning the "enterprise," let alone an "ongoing"

12  enterprise engaged in repeated acts of an arguably <u>criminal</u> nature.[41]

13     For all of the foregoing reasons, the Court concludes that there

14  is no possibility of Plaintiffs stating a proper RICO claim.  Thus, as

15  has been stated, the Tenth Claim is DISMISSED, with prejudice.

16

17     **5.   Plaintiffs' Equitable Claims (Eleventh and Twelfth)**

18     Plaintiffs' Eleventh Claim, for "Declaratory Relief" against all

19  Defendants, and their Twelfth Claim, for "Injunctive Relief" against

20  Dreamworks and Random House, appear to be wholly dependent on their

21  copyright claims and/or their Lanham Act claims.  Thus, the Court also

22  hereby DISMISSES the Eleventh and Twelfth Claims, with leave to amend

23  under the same conditions as now apply to the copyright claims.

24

25     [41] Once again, Plaintiffs' notation that Defendant Spielberg may
26  have retained counsel for those co-Defendants who have now joined the
    group the Court has called the "Dreamworks Defendants" is irrelevant
27  to the question presented.  Whether or not Spielberg or any Defendant
    has extended help to any other Defendant has nothing to do with proof
28  of an "ongoing" <u>criminal</u> "enterprise" and/or a "functional unit."

1    **6.   The Remaining State Law Claims (Fifth through Ninth)**

2    The Court has now dismissed with prejudice Plaintiffs' claims

3    under the Lanham Act and the RICO statute, and has given Plaintiffs

4    the option as to whether to amend their First and Second copyright

5    claims or to simply allow the current case to expire, such that the

6    Court would also dismiss the copyright claims for lack of jurisdiction

7    (without prejudice).  If all federal claims in the current complaint

8    are in fact dismissed, the Court will decline to exercise supplemental

9    jurisdiction over the remaining state law claims.[42]  Therefore, the

10   Court will not now decide the Motion as to those claims.[43]  Thus, the

11   Court DENIES the Motion as to the Fifth through Ninth Claims, without

12   prejudice to Defendants' right to bring a similar motion in future, if

13   the claims remain or are re-alleged in a subsequent complaint.

14

15   **B.   Defendants' Motion for Summary Judgment**

16   Having dismissed Plaintiffs' copyright claims, which are the sole

17   subject of Defendants' SJ Motion, the Court need not reach either the

18   Motion for Summary Judgment itself or Plaintiffs' Rule 56(f) "Motion"

19   filed in response thereto.  Thus, the Court hereby DENIES both these

20   Motions as moot, without prejudice to their subsequent re-filing.

21   _____

22   [42] See 28 U.S.C. § 1367(c) ("The district courts may decline to
     exercise supplemental jurisdiction . . . [if] (3) the district court
23   has dismissed all claims over which it has original jurisdiction").

24   [43] The Court notes that in any case the current Motion to Dismiss
     cannot result in dismissal of the entire complaint, given that it does
25   not address the Sixth Claim for Relief (Breach of Contract), asserted
     only as to Defendant Petersen.  If the instant Motion to Dismiss would
26   be dispositive of the entire case, judicial efficiency might militate
27   in favor of deciding the state law claims.  However, where it is quite
     possible that no decision from this Court will ever be required on the
28   state law claims, the Court will not now delve into these questions.

### V.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the Motion to Dismiss.  In particular, the Motion is GRANTED as to Plaintiffs' claims under the Copyright Act, the Lanham Act, and the RICO statutes, as well as the requests for injunctive or declaratory relief thereon (First, Second, Third, Fourth, Tenth, Eleventh, and Twelfth Claims).  The First and Second Claims are DISMISSED with leave to amend, as are the Eleventh and Twelfth (only to the extent they may be restated solely based on copyright).  The Third, Fourth, and Tenth Claims are DISMISSED with prejudice, as are the Eleventh and Twelfth Claims (to the extent they are based on the Lanham Act).

The Court DENIES the Motion as to the state law (Fifth through Ninth) Claims for Relief, without prejudice to these Defendants' right to file a future motion making the same arguments.  The Court DENIES both Defendants' Motion for Summary Judgment, and the "Motion" under Rule 56(f) filed by Plaintiffs in opposition, without prejudice.

Leave to amend the First and Second Claims for Relief is granted under the following conditions.  Plaintiffs may, by **April 23, 2001**, file a Second Amended Complaint ("SAC") which re-states the First and Second Claims based solely on works for which Plaintiffs can submit Certificates of Registration.  If no SAC is filed by that date, the First and Second Claims will be dismissed, without prejudice.  This will also result in a dismissal without prejudice of the entire case, as the Court will then decline jurisdiction over the state law claims.

DATED:   _March 12, 2001_

_Audrey B Collins_

**AUDREY B. COLLINS**
**UNITED STATES DISTRICT JUDGE**

43